UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| CARL ANGUS, individually and on behalf of the E.W. Burman, Inc. Profit Sharing Plan,<br>　　Plaintiff,<br><br>　　v.<br><br>EDWARD BURMAN, PAUL BURMAN, and E.W. BURMAN, INC.,<br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 24-cv-328-MRD-AEM<br>)<br>)<br>)<br>)<br>)<br>) |

# MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

After 38 years of working with, and for, Edward and Paul Burman at E.W. Burman, Inc. (collectively "Defendants"), Carl Angus decided to call it a career and started making plans to move to Portugal in September 2023. In January 2023, he told the Burmans this plan and mentioned that he wanted to cash-out his funds from the E.W. Burman Inc. Profit Sharing Plan and Trust ("Plan"), an employer sponsored defined-contribution Plan, as soon as possible. On July 21, 2023, Defendants distributed $1,356,369.31 to Mr. Angus. The problem, he contends, is that this amount was based on the account value as of December 31, 2022 when it should have been valued as of December 31, 2023. Had the Defendants waited until December 31, 2023 to value the account, Mr. Angus claims he would have received over $170,000 in additional funds based on the stock market's 2023 performance. After

communicating with Plan Administrator and exhausting the administrative appeal process, Mr. Angus initiated this lawsuit to collect the additional funds.

Now before the Court for resolution are the parties' cross Motions for Summary Judgment. ECF Nos. 34, 37. The Court heard argument from the parties on January 28, 2026. For the following reasons, Mr. Angus' Motion for Summary Judgment is granted, and Defendants' Motion for Summary Judgment is denied.

## I. BACKGROUND[1]

E.W. Burman, Inc. is a general contracting and construction management services firm in Warwick, Rhode Island. Defs' Statement of Undisputed Facts in Support of Mot. Summ. J. ¶ 1 ("DSUF"); ECF No. 34-2. In 1984, E.W. Burman started the Plan which provides retirement benefits to participants. *Id.* ¶¶ 2–3. Carl Angus worked at E.W. Burman, Inc. from September 1984 until August 2023, and participated in the Plan from September 1984 to July 2023. *Id.* ¶ 5; Pl.'s Statement of Undisputed Facts in Support of Mot. Summ. J. ¶ 31 ("PSUF"); ECF No. 35-3.[2]

In January 2023, Angus informed the Burmans that he intended to retire and move to Portugal at some point in 2023. ECF No. 34-2 ¶ 6; ECF No. 35-3 ¶ 33. During that January 2023 interaction, Angus told the Burmans that he wished to cash-out from the Plan and have the funds distributed to him as soon as possible. ECF No.

---

[1] On a motion for summary judgment in an ERISA benefit-denial case, "the non-moving party is not entitled to the usual inferences in its favor." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).

[2] The Court will cite to the unredacted and unsealed PSUF which is located at ECF No. 35-3. Plaintiff complied with LR CV 56(a)(2) by filing ECF No. 38, which is a sealed version of PSUF.

34-2 ¶ 11; ECF No. 35-3 ¶ 34.  The Burmans explained to Angus that if he retired before year-end 2023, he would receive the funds in his Plan account as valued on December 31, 2022.  ECF No. 34-2 ¶ 8.  Angus does not recall being told that information and instead claims that Edward Burman told him that a mid-2023 retirement meant Angus could not receive his distribution until 2024.  ECF No. 35-3 ¶ 35.  According to Angus, Edward Burman eventually took the position that Angus could receive the distribution in 2023 but that he would lose out on the Plan profit-sharing contribution for that year.  *Id.* ¶ 36.  Angus had no issue with forgoing his 2023 profit-sharing contributions but suggests that parties never agreed that Angus' distribution would reflect the year-end 2022 valuation, or that a mid-2023 distribution meant he would not be entitled to any 2023 investment earnings.  *Id.* ¶ 38.

Fast forward to May 2023.  Angus received his annual account statement and requested a withdrawal of the account balance.  ECF No. 34-2 ¶ 16.  On May 18, 2023, Paul Burman—the Plan Administrator—contacted Pat Ambrosio from Sentinel Benefits and Financial Group—the Plan recordkeeper—and requested a transfer form because an employee was retiring.  ECF No. 35-3 ¶ 41.  The recordkeeper responded to the Plan Administrator that "the plan document states the distributions may be made after the last day of the plan year coincident or next following date of severance.  So if [that] person retires in 2023 he/she cannot take money out until after 12-31-2023."  *Id.* ¶ 42.  Regardless, Burman told the recordkeeper to process Angus' valuation date "as of 12/31/2022." *Id.* ¶ 43.  Once again, the recordkeeper stated that

3

Angus did not qualify for retirement under the Plan and the Adoption Agreement[3] and that he should be considered a "terminated employee." *Id.* ¶ 46. The Plan Administrator, however, again instructed the recordkeeper to process Angus' separation from service as of December 31, 2022, which she did. *Id.* ¶ 47.

On July 5, 2023, Paul Burman "requested a transfer of [Angus'] [12-31-2022] Plan balance to his IRA account" which was distributed to Angus on July 21, 2023. ECF No. 34-2 ¶ 12; ECF No. 35-3 ¶ 48. Approximately two weeks later, at the beginning of August 2023, Angus officially left E.W. Burman and began his retirement. ECF No. 35-3 ¶ 31.

The following month, September 2023, Angus inquired about, and then demanded, compensation for any gains in the Plan's 2023 valuation. ECF No. 34-2 ¶ 17. After consulting with the Plan recordkeeper, Edward Burman responded to Angus and justified the rationale for the December 31, 2022 valuation by explaining the following:

> Our [Plan] is set to be valued once a year on December 31, as dictated by the IRS approved plan.
>
> In your case, you asked that this money be released as soon as possible and you needed it to facilitate your move to Portugal. Therefore, your distribution was based on the valuation of December 31, 2022, as per the IRS regulations.
>
> If you had waited to include the time worked in 2023, your distribution would have been in 2024.
>
> These same rules applied to [person 1] and [person 2] upon their retirements.

---

[3] Together, the Plan and Adoption Agreement constitute the full E.W. Burman Inc. Profit Sharing Plan and Trust ("Plan").

4

>   This was not a personal IRA account, it is a Profit Sharing Trust under strict rules and regulations of the IRS.

*Id.* ¶ 18.

In February 2024, Angus made a claim to the Plan Administrator for additional Plan benefits—the difference between the December 31, 2023 account valuation and the December 31, 2022 valuation. ECF No. 34-2 ¶¶ 19, 21; ECF No. 35-3 ¶ 49. After both sides again explained their positions to each other over a series of emails, Angus filed an administrative appeal with the Plan Administrator on April 30, 2024. ECF No. 34-2 ¶¶ 20–25; ECF No. 35-3 ¶¶ 49–55. On June 3, 2024, the Plan Administrator, once again, denied Angus' request for the additional funds and denied his administrative appeal. ECF No. 34-2 ¶ 28; ECF No. 35-3 ¶ 59. Angus was notified of the denial when he received the Plan Administrator's Uphold Letter. The Uphold Letter relied on the Burmans' declarations recapping the factual background and benefit determination and further explained that specific Plan language supported the decision to deny additional benefits. *Id.* ¶¶ 29–30.

After receiving the Uphold Letter, Angus attempted to supplement his appeal, but the Plan Administrator rejected the supplemental appeal since the Plan allows only one administrative appeal. *Id.* ¶ 31. On August 14, 2024, Angus filed this lawsuit, alleging a few violations of ERISA, including: Count (I) Benefits owed pursuant to a plan, under 29 U.S.C. § 1132(a)(1)(B),[4] Count (II) Breach of fiduciary

---

[4] 29 U.S.C. § 1132(a)(1)(B): A civil action may be brought (1) by a participant or beneficiary … (B) to recover benefits due to him under the terms of his plan, to

5

duty under 29 U.S.C. § 1132(a)(2)–(a)(3),[5] and Count (III) Violation of the anti-inurement clause, under 29 U.S.C. § 1103(c)(1).[6]

## II. LEGAL STANDARD

On a motion for summary judgment in an ERISA benefit-denial case, "the non-moving party is not entitled to the usual inferences in its favor." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005). Instead, "summary judgment is simply a vehicle for deciding the issue." *Id*. The role of the district court in such a case is to "sit [] more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative

---

enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

[5] 29 U.S.C. § 1132(a)(2), (3): A civil action may be brought; (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title; (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1109: Liability for breach of fiduciary duty: (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

[6] 29 U.S.C. § 1103(c)(1): Assets of plan not to inure to benefit of employer; allowable purposes of holding plan assets: **(1)** Except as provided … the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002). "The Court's review is generally limited to the administrative record and focuses on the plan administrator's final, post-appeal decision." *Rogers v. Unum Life Ins. Co. of Am.*, 799 F. Supp. 3d 40, 43 (D. Mass. 2025) (citing *Terry v. Bayer Corp.*, 145 F.3d 28, 35 (1st Cir. 1998)). "Where the record is fully developed, contains no significant factual disputes, and establishes the claimant is entitled to benefits, the appropriate remedy is an award of benefits." *Id.* (citing *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003)).

### III. DISCUSSION

Sitting as an appellate tribunal in this case, the Court must first determine whether to apply an abuse of discretion or de novo standard of review. Once that is decided, the Court will move on to evaluate the claims.

#### A. Standard of Review

The parties disagree on which standard applies, with the Defendants asking this Court to review the Plan Administrator's decision under the abuse of discretion standard and the Plaintiff advocating for a de novo standard to apply. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The First Circuit has explained that "[w]hen a Plan Administrator has discretion to determine an applicant's eligibility for benefits … the administrator's decision must be upheld

7

unless 'arbitrary, capricious, or an abuse of discretion.'" *Vlass v. Raytheon Emp.'s Disability Tr.*, 244 F.3d 27, 29–30 (1st Cir. 2001) (quoting *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 183 (1st Cir. 1998)). The administrator's decision must be upheld "if it is reasoned and 'supported by substantial evidence in the record.'" *Id.* at 30 (quoting *Doyle*, 144 F.3d at 184). Under this standard, "[s]ubstantial evidence [] means evidence reasonably sufficient to support a conclusion." *Doyle*, 144 F.3d at 184.

Here, Section 10.4(b) of the Plan provides complete discretionary authority to the Plan Administrator in interpreting the Plan and rendering claims determinations. Section 10.4(b) provides the following:

> **Administrator's discretion/nondiscriminatory administration:** The Administrator has *total and complete discretion to interpret and construe the Plan and to determine all questions arising in the administration*, interpretation and application of the Plan. Any determination the Administrator makes under the Plan is final and binding upon any affected persons. The Administrator must exercise all of its Plan powers and discretion, and perform all of its duties, in a uniform and nondiscriminatory manner.

ECF No. 34-3 at 162 (emphasis added). Defendants suggest that because the "Plan granted complete authority to the Plan Administrator," therefore the arbitrary and capricious standard applies. ECF No. 34-1 at 10. Angus urges the Court to apply a de novo standard of review to the Plan Administrator's decision because process was "fraught by procedural irregularities." ECF No. 37 at 11; *see Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 813 F.3d 420, 425 (1st Cir. 2016) (explaining that a de novo standard of review applies when procedural irregularities are present in the administrative process *and* the claimant can show prejudice).

To support Angus' contention that the review process was fraught with procedural irregularities, Angus points to emails between the Burmans and the plan recordkeeper that were withheld from Angus during the review process but are filed with this Court as part of the Administrative Record at Exhibit.  ECF No. 37 at 11.  Those emails show that the recordkeeper informed the Plan Administrator that Angus' separation was not a retirement, but that he was to be considered a "terminated participant."  ECF No. 35-3 ¶¶ 45–46.  Even more, the recordkeeper explained that the Plan only allowed distributions "after the last day of the plan year coincident or next following date of severance."  *Id.* ¶ 42.  Angus further argues that since the decision provided a "false" reason for the denial of benefits—a backdated retirement—the Court should not afford that decision any deference.  *Id.* ¶ 47.

The Court agrees that the withheld emails should have been produced and considered by the Plan Administrator during the administrative review process.  These emails were directly on point with Angus' argument that he was entitled to additional benefits and provided context on how to apply the provisions of the Plan.  That said, the Court does not find that excluding these emails deprived Angus of the "full and fair review" contemplated by 29 U.S.C. § 1133 or 29 CFR § 2560.503-1(h)(2) because the Plan Administrator had all this information when making the appeal determination because he was the one who communicated with the recordkeeper.  Even if Angus was deprived of the "full and fair review," simply receiving an adverse decision does not amount to prejudice to the claimant.  Based on the clear language of Section 10.4(b) quoted above, which grants complete discretionary authority to the

9

Plan Administrator, the Court will apply an arbitrary and capricious standard of review.[7]

### B. Benefits owed pursuant to a plan (Count I)

Much of Defendants' argument urging this Court to uphold the Plan Administrator's decision hinges on Angus stating that he was moving to Portugal and wanted his money "as soon as possible." *See* ECF No. 34-1 at 6–8 (explaining the Plan Administrator's decision to deny additional benefits). In deciding that the mid-year distribution was in fact allowed under the Plan, the Plan Administrator relied on Section 6.7:

> TIME OF DISTRIBUTION
> Except as limited by Section 6.8, whenever a distribution is to be made, or a series of payments are to commence, the distribution or series of payments may be made or begun as soon as practicable. Notwithstanding anything in the Plan to the contrary, *unless a Participant otherwise elects*, payments of benefits under the Plan will begin not later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs: (a) the date on which the Participant attains the earlier of age 65 or the Normal Retirement Age specified herein: (b) the tenth (10th) anniversary of the year in which the Participant commenced participation in the Plan; or (c) the date the Participant terminates service with the Employer.

ECF No. 34-3 at 146 (emphasis added). Defendants argue that Angus exercised his right to "otherwise elect," which the Plan Administrator explained to him in the

---

[7] Before moving on, the Court acknowledges Angus' argument that there was a conflict of interest with Burman adjudicating claims and paying awarded benefits. ECF No. 41 at 10; *see Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (holding a reviewing court should consider the conflict of interest arising from the dual role of an entity as an ERISA plan administrator and payer of plan benefits as a factor in determining whether the plan administrator has abused its discretion in denying benefits). The Court notes the inherent potential conflict of interest created by the administrative review structure and considered it while deciding these motions.

Uphold Letter. *Id.* at 248–51. In response, Angus argues that Defendants are misinterpreting the provision and instead suggests the "unless a Participant otherwise elects" language means the Participant may elect to *delay* that withdrawal, not that they can elect to withdraw the money before the end of the Plan Year. According to Angus, following Defendants' interpretation of Section 6.7 would render the rest of the section superfluous and conflict with other provisions in the Plan.

Angus also contends that he is a Terminated Participant, that Section 6.4(a) governs his determination of benefits, and that the benefits should have been distributed consistent with Section 6.5. ECF No. 37 at 12–16. Section 1.79 of the Plan defines a Terminated Participant as "a person who has been a Participant, but whose employment has been terminated with the Employer…other than by death, Total and Permanent Disability or retirement." ECF No. 34-3 at 115. While "retirement" is not defined in the Plan, Section 1.72 defines Retirement Date as "the date as of which a Participant retires for reasons other than Total and Permanent Disability, regardless of whether such retirement occurs on a Participant's Normal Retirement Date,[8] Early Retirement Date,[9] or Late Retirement Date. *Id.* at 114.

The Administrative Record before the Court and unambiguous Plan language lead this Court to conclude that the Plan Administrator's decision to deny Angus' request for additional benefits was unsupported and unreasonable. First, during the

---

[8] The Plan's Adoption Agreement sets the "Normal Retirement Age" at 65. ECF 34-3 at 25.

[9] The Adoption Agreement also indicates that "no early retirement provision [is] provided." ECF No. 34-3 at 25.

11

discovery process in this Court, Defendants withheld highly relevant and material emails between the Plan Administrator and the recordkeeper from Sentinel Benefits Group.[10] There are various emails from January 2023–June 2023 where the recordkeeper: (a) explains to the Plan Administrator that Plaintiff is to be considered a Terminated Participant, (b) asks for Angus's Retirement Date and is told it was 12/31/2022 (which is false[11]), and (c) explains "the plan document states that the distributions may be made after the last day of the Plan Year coincident or next following date of severance. So if a person retires in 2023 he/she cannot take money out until after 12-31-2023." ECF No. 34-3 at 268, 309–11, 320, 322–23. While the Administrator chose to ignore the recordkeeper's emails, they both support Angus' interpretation of the Plan and provide a useful roadmap for this Court.

The unambiguous language in the Plan supports that Angus was a Terminated Participant, not a retiree, and that the account valuation and payout should have occurred on/after December 31, 2023, not 2022. First, Angus fits the Plan's definition of a Terminated Participant (Section 1.79). Next, Angus never attained the Normal Retirement Date[12] which the Adoption Agreement sets at 65 years old. ECF No. 34-3 at 25. Third, the Adoption Agreement clearly states that there is no early

---

[10] While these records were not revealed during the administrative appeal process, they are part of the Administrative Record before this Court. The records were disclosed to Plaintiffs during the discovery process and Defendants submitted those documents as part of the Administrative Record.

[11] Angus separated from service the first week of August 2023. This date is not in dispute.

[12] Normal Retirement Age as defined in Section 1.55 of the Plan: "the age elected in the Adoption Agreement …"

12

retirement provision provided under the Plan. *Id.* And finally, in the Adoption Agreement under the heading "DISTRIBUTIONS," it clearly states that for accounts in excess of $5,000 "[d]istributions may be made as soon as administratively feasible *after the last day of the Plan Year coincident with or next following severance of employment.*" *Id.* at 42 (emphasis added).

The Court also relies on section 6.4, which explains how benefits are determined upon termination. *Id.* at 140. That Section provides the following:

> (a) Payment on severance of employment. If a Participant's employment with the Employer … is severed for any reason other than death, Total and Permanent Disability, or attainment of the Participant's Retirement Date, then such Participant shall be entitled to such benefits as are provided herein.
>
> …
>
> Distribution of the funds due to a Terminated Participant shall be made on the occurrence of any event which would result in the distribution had the Terminated Participant remained in the employ of the Employer … However, at the election of the Participant, the Administrator shall direct that the entire Vested portion of the Terminated Participants Combined Accounts be payable to such Terminated Participant *provided the conditions, if any, set forth in the Adoption Agreement have been satisfied*.

*Id.* (emphasis added). Here, the only applicable condition set forth in the Adoption Agreement is that "[d]istributions may be made as soon as administratively feasible after the last day of the Plan Year coincident with or next following severance of employment." *Id.* at 42. Defendants ask this Court to ignore these provisions and to instead focus solely on Section 6.7 because Angus wanted his money "as soon as possible." But doing so would lead to conflict between various provisions in the Plan and Adoption Agreement.

As the First Circuit has explained, "courts are to construe ERISA plans by employing accepted principles of contract and trust law." *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 31 (1st Cir. 1991). The Circuit then clarified that courts "give preeminence to the natural meaning of ERISA plan terms, and [courts] may not supplant such meaning with rigid definitions or contrary interpretations offered by the parties." *Id.* at 31–32 (citing *Firestone Tire and Rubber*, 489 U.S. at 112). Under Rhode Island law,[13] "[t]he Court considers the policy in its entirety and does not 'establish ambiguity by viewing a word in isolation or taking a phrase out of context.'" *Bliss Mine Rd. Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.*, 11 A.3d 1078, 1083 (R.I. 2010) (quoting *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 552 (R.I. 1990)); *see also Johnson v. Amer. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 2013) ("[c]ourts must look at the ERISA plan as a whole and determine the provision's meaning in the context of the entire agreement. And, because, contracts are construed as a whole, courts should seek to give effect to every provision in an ERISA plan, avoiding any interpretation that renders a particular provision superfluous or meaningless.") (cleaned up).

These legal principles indicate that the Plan Administrator's interpretation was unreasonable because it created conflict between the Plan terms and the Adoption Agreement. For example, the Plan Administrator claims it was proper to

---

[13] Section 10.4 of the Plan explains that it "shall be construed and enforced according to … the laws of the state … in which the Employer's principal office is located." E.W. Burman is in Warwick, Rhode Island. ECF No. 34-2 ¶ 1. The Adoption Agreement confirms this. ECF 34-2 at 60 (subsection "o").

issue Angus a mid-year distribution because Section 6.7 allowed Angus to elect to receive an early distribution. *See* ECF No. 34-1 at 8, 13–14. Yet, Section 38 of the Adoption Agreement clearly states that "[i]n-service distributions are NOT permitted." ECF No. 44 (emphasis in original). Here, Angus' funds were distributed to him on July 21, 2023—while he was still an employee—and he officially ended his employment approximately two weeks later. ECF No. 34-2 ¶ 12; ECF No. 35-3 ¶¶ 31, 48. Further, the Plan Administrator's argument that the language "unless a participant otherwise elects" permitted Angus to cash-out early is unreasonable and unsupported. Accepting this argument would be to defeat the purpose of a retirement plan since a plan participant could demand money at any time, which is not the purpose of the Plan. *See* ECF No. 34-3 at 63 ("A pension benefit plan … has been adopted by the company for the purpose or rewarding long and loyal service to the company by providing to employees additional financial security at retirement … [s]ince the principal purpose of the plan is to provide benefits at normal retirement age"). The more reasonable interpretation, taking into consideration the other Plan provisions and the purpose of retirement plans generally, is that the participant may elect to defer the time of distribution *beyond* the "the sixtieth (60th) day after the close of the Plan Year."

Defendants also suggest that the Plan's explicit definitions of Early Retirement Date and Normal Retirement date should be interpreted as "inclusive of those dates as well as any other date upon which the participant retires for reasons other than disability." ECF No. 34-1 at 14–15. However, neither the Adoption Agreement nor

15

the Plan permit such an expansive view because it is clear that "early retirement" is not an option, and the "normal retirement" is age 65.[14]

Defendants' other argument—that there was an agreement with Angus to distribute the funds early—is also unsupported by law or fact. While Angus admits he wanted his money as soon as possible, nothing in the record supports that he and the Defendants agreed to change the terms of the Plan to enable his distribution to take place mid-year. Even so, "ERISA plans must be in writing and cannot be modified orally." *Livick v. The Gillette Co.*, 524 F.3d 24, 31 (1st Cir. 2008). Further, "if the provision is clear, however, an informal statement in conflict with it is in effect purporting to *modify* the plan term, rendering any reliance on it inherently unreasonable." *Id.* (citing *Law v. Ernst & Young*, 956 F.2d 364, 370 (1st Cir. 1992)). This considered, the Court cannot rely on any informal or oral agreements because they cause conflict with the clear and unambiguous Plan provisions.

In sum, the Plan required Angus' account to be valued as of December 31, 2023, not 2022, and he should have been paid out sometime in 2024. Based on a review of the Administrative Record, which is comprised of the Plan, the Adoption Agreement, and email communications between the parties, the Administrator's decision is not supported by substantial evidence. *Leahy v. Raytheon Co.*, 315 F.3d 11, 17 (1st Cir.

---

[14] When Defendants set up the Plan, they elected to not permit early retirement and set the normal retirement age at 65. They now seek to alter the meanings of their own selections which this Court will not entertain given that the provisions are clear and unambiguous.

2002). The Plan Administrator's decision to deny the extra benefits is reversed, and Plaintiff's request for summary judgment on Count One is granted.[15]

## IV. CONCLUSION

For all these reasons, the Court grants Plaintiff's Motion for Summary Judgment on Count I of the Complaint, and denies Defendants' Motion for Summary Judgment. The Court may not enter final judgment until it determines the appropriate remedy for Count I. The parties are ordered to submit a briefing schedule on the remedy issue to this Court within twenty-one days of entry of this Order.

IT IS SO ORDERED.

_/s/ Melissa R. DuBose_
Melissa R. DuBose
United States District Judge

03/02/2026

---

[15] Angus presented Counts II and II as alternative to Count I. ECF No. 41 at 15. Accordingly, the Court need not address Counts II or III, as this matter is properly resolved on Count I.